JOHNSON FISTEL, LLP
Frank J. Johnson, Esq. (SBN 174882)
FrankJ@johnsonfistel.com
Phong L. Tran, Esq. (SBN 204961)
PhongT@johnsonfistel.com
655 West Broadway, Suite 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

*Liaison Counsel for Plaintiff Miguel Porras*

[Additional counsel appear on signature page]

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MIGUEL PORRAS, Individually and on Behalf of All Others Similarly Situated, | Case No. 2:19-CV-1542 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | |
| POINT BLANK ENTERPRISES, INC., | <u>DEMAND FOR JURY TRIAL</u> |
| Defendant. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff Miguel Porras ("Sergeant Porras" or "Plaintiff"), by and through his undersigned counsel, brings this class action against defendant Point Blank Enterprises, Inc. ("PBE" or "Defendant), on behalf of himself and a class of similarly situated persons (the "Class" or "Class Members").

## INTRODUCTION

1.     PBE is a manufacturer of law enforcement protective products, including ballistic resistant soft body armor (commonly referred to as bullet resistant vests) which PBE sells through various channels (directly, through manufacturer sales representatives employed by PBE, or through authorized distributors and representatives) to police officers and others all across the United States.    PBE manufactures these products through wholly-owned subsidiaries and/or brand names, including Point Blank Body Armor, Inc. ("PBBA"), Protective Apparel Corporation of America ("PACA"), Paraclete, Protective Products Enterprises, and others.

2.     This class action arises from the sale of defective PBBA and PACA concealable model vests manufactured by PBE containing what Defendant touts in its marketing materials as a proprietary and exclusive "Self-Suspending Ballistic System" (SSBS) feature ("SSBS Vests").  As described below, the SSBS Vests are represented and warranted to have certain qualities and performance characteristics which they, in fact, do not have.  Due to inherent manufacturing defects, the SSBS Vests pose a life-threatening safety issue and cannot be reasonably relied upon for their intended use.

3.     Bullet resistant vests typically contain two primary components: (1) the ballistic panel system; and (2) the carrier or outer garment in which the ballistic panel system is placed.

4.     Traditionally, body armor manufacturers do not tamper with the integrity of the ballistic panels by incorporating attachments or a "suspension system" into the ballistic panel system.  Rather, any straps or suspension system are incorporated into the carrier, including any Velcro or other similar material.  In the typical configuration, if the Velcro, or for that matter any other component of the outer carrier wears out,

1   purchasers can simply order a new carrier and change out the ballistic panels from the

2   old carrier to the new carrier in a few minutes.   All other body armor manufacturers

3   use this traditional method for their concealable vests.

4        5.    In an SSBS Vest, the ballistic panel system includes the SSBS.  PBE

5   advertises the SSBS as part of the ballistic system that features several components that

6   form and are integrated into the ballistic panels.  Those components include shoulder

7   straps that connect to a Velcro-like material sewn directly into the ballistic panels.  The

8   carrier then covers the ballistic panel system, but, unlike in a typical vest, the carrier

9   for an SSBS Vest does not have its own shoulder straps or other suspension system to

10   hold it in place when being worn.  With SSBS Vests, that "suspension system" is

11   directly incorporated into the ballistic panels.  Indeed, the SSBS is directly stitched and

12   tethered to the ballistic fabric.

13        6.    Figures 1, 2 and 3 below show the ballistic panel system of an SSBS Vest,

14   *without the carrier*, showing parts of the SSBS including the Velcro-like half circle c-

15   clamps (sometimes called a bird's mouth or gator mouth) sewn into the top of the

16   ballistic panels and the straps that connect the front ballistic panel to the back ballistic

17   panel (both panels and the SSBS form the overall ballistic panel system).  Figure 1 is a

18   single ballistic panel from an SSBS Vest with the sewn-in Velcro-like c-clamps at the

19   top into which the straps are inserted.  Figure 2 is a close-up of one of the c-clamps.

20   Figure 3 shows an entire ballistic panel system of an SSBS Vest.

21

22

23

24

25

26

27

28



FIGURE 1

CLASS ACTION COMPLAINT



FIGURE 2



FIGURE 3

CLASS ACTION COMPLAINT

7.      Figures 4 and 5 below show the differences between the carrier for a SSBS Vest and the carrier of a traditional vest.  Figure 4 shows the carrier of a SSBS Vest, which consists of the front and back coverings for the ballistic panel system plus the waist straps (notably, no shoulder strapping system).  As shown, the SSBS is not part of the carrier.  Carriers are sold by PBE separately and do not come with any SSBS component such as the shoulder straps.  By comparison, Figure 5 shows an industry-standard carrier where the shoulder straps are part and parcel of the carrier, not the ballistic panels.  With the industry-standard design, if either shoulder strap fails for any reason, the ballistic panels can simply be removed from their pouches inside the old carrier and inserted into the pouches of a new replacement carrier.  Unlike with SSBS Vests, this can be done by an officer without having to return the vest to the manufacturer (which means the officer is not without a vest and not violating a mandatory wear policy).



FIGURE 4

CLASS ACTION COMPLAINT



FIGURE 5

8.      All SSBS Vests have uniform and uniformly defective SSBS.  The SSBS contains latent defects in material, workmanship, and design that result in the vests falling apart on officers in the line of duty and present a safety hazard.  The materials used in the SSBS are inadequate for the foreseeable cycling (engaging and disengaging) of the SSBS.  The SSBS deteriorates and weakens to the point where, well within the five-year useful life and warranty period of the vests, it does not have sufficient strength to securely support the weight of the vest when on an officer and falls apart, even though cycling the SSBS is its intended use.  Likewise, the foreseeable exposure of the SSBS to moisture (*e.g.*, sweat or rain), rapidly accelerates the weakening of the SSBS closure.  Constant tension and pulling on the SSBS also results in failure, even where the SSBS is infrequently cycled, for example, to remove and clean the outer carrier of the vest, which requires disconnecting the SSBS.  Substandard stitching of the c-clamps to the ballistic panels also causes a system failure of the SSBS, as rapidly as within a few months.

9.      The SSBS Vests unexpectedly fall apart in the line of duty when movement causes the SSBS to fail and the ballistic panels to separate from the shoulder straps.  When that happens, for example, the ballistic panel sinks down inside the user's uniform and cannot be worn.  The user then needs to stop whatever he or she is doing,

CLASS ACTION COMPLAINT

1  find a safe place, remove their uniform and find some way to hold the vest in place

2  other than the failed SSBS.

3      10.    The defects in the SSBS render this life and death product unsuitable for

4  use, regardless of whether the SSBS has already failed in the line of duty, as it has with

5  Plaintiff.

6      11.    As a result of reported problems with the SSBS, certain states have barred

7  sale of SSBS Vests through state contracts, including Texas and the Commonwealth of

8  Massachusetts.

9      12.    Defendant breached its express and implied warranties and

10 misrepresented and omitted material facts regarding the quality, characteristics,

11 suitability, and safety of the SSBS Vests.  Defendant has also concealed that the vests

12 contain manufacturing defects that create an imminent danger and risk of injury to

13 Plaintiff and others who use and depend upon the vests, many of whom are law

14 enforcement officers whose job it is to protect the public.[1]

15     13.    The defects in the SSBS Vests manifest and are present when the vests

16 exit the manufacturing line and cannot be detected by Class Members until the vests

17 fail.  In addition to concealing the latent defects in the SSBS Vests, Defendant has

18 knowingly and affirmatively publicized false and misleading information about the

19

20

---

21 [1] Defendant has a long history of selling defective ballistic vests, denying they have
22 manufacturing defects, and affirmatively attempting to conceal the defects.  Those
   actions resulted in several class actions (including an investigation and suit by the
23 United States under the False Claims Act, 31 U.S. Code §§ 3729-3733) that resulted in
   the recall and replacement of tens of millions of dollars of vests.  *United States v. Point*
24 *Blank Body Armor, Inc., et al.*, Case No. 1:10-cv-01716 (D.D.C. 2010); *Southern States*
   *Police Benevolent Association, Inc., et al. v. Point Blank Body Armor, Inc.*,
   CACE05000084 (Seventeenth Cir. Broward Co., Fla.); *Jamie Norris, et al. v.*
25 *Protective Apparel Corp. of America, et al.*, CACE05012961 (Seventeenth Cir.
   Broward Co., Fla.); *Thomas Kiefer, et al. v. Protective Products International*,
26 CACE05016039 (Seventeenth Cir. Broward Co., Fla.); *See also SEC v. Point Blank*
   *Solutions, Inc.*, Case No. 11-cv-60431 (S.D. Fla 2011) (action by Regional Miami
27 Office for "massive accounting fraud," for being "willfully blind to numerous red
   flags" and for issuing "materially false and misleading periodic reports" to investors
28 and others.); https://www.sec.gov/news/press/2011/2011-52.htm.

1    effectiveness and durability of the SSBS to induce sales, has refused to notify any

2    purchasers of the defects, and has refused to recall them.

3         14.    Plaintiff brings this action on behalf of himself and all other individuals

4    and entities similarly situated in California that purchased a new SSBS Vest from

5    Defendant or one of its manufacturer's sales representatives or authorized distributors.

6         15.    Plaintiff alleges claims for breaches of express and implied warranties, for

7    violations of California Business & Professions Code §§ 17500, *et seq.*, violations of

8    California Business & Professions Code §§ 17200, *et seq.*, and for fraudulent

9    concealment.

10        16.    Plaintiff brings this action on his own behalf and on behalf of the class

11   defined below, comprised of individuals and entities in California that purchased a new

12   SSBS Vest, to redress breach of warranties as well as unlawful, unfair, deceptive, and

13   fraudulent conduct by Defendant.

14                              **JURISDICTION AND VENUE**

15        17.    This Court has original jurisdiction over the subject matter of this action

16   pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because:

17   (i) the aggregate amount in controversy of this action, exclusive of interest and costs,

18   exceeds $5,000,000; (ii) there are more than 100 members in the Class; and (iii) many

19   of the Class Members, including Plaintiff, are citizens of a state different from that of

20   Defendant.  28 U.S.C. § 1332(d)(3) is inapplicable here.

21        18.    PBE has sold thousands of SSBS Vests in California during the relevant

22   time periods at issue.  The precise number of SSBS Vests sold during the relevant time

23   periods, the identity of each purchaser, the organization or entity (where applicable) to

24   which each purchaser is associated, the date of purchase, the location of purchase, the

25   model SSBS Vest purchased, the serial numbers of the ballistic panels, the date of

26   manufacture, the dates of issuance and invoicing, the address where Defendant shipped

27   each vest, the exact price Defendant received for each vest, and more, are all readily

28   documented in Defendant's sales databases.  PBE is fully capable of identifying all

1   Class Members through its own databases and has represented precisely that to courts

2   in connection with prior recalls of tens of thousands of vests worth millions of dollars.

3         19.    This Court has personal jurisdiction over PBE because PBE is authorized

4   to do business in this District, conducts substantial business in this District, including

5   directly marketing, selling, warranting, and shipping SSBS Vests in this District.

6   Plaintiff's claims arise out of PBE's direct contacts with this District.  Each of these

7   facts independently, but also all of these facts together, are sufficient to render the

8   exercise of jurisdiction by this Court over PBE.

9         20.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a) and (b)

10   because Plaintiff resides in this District.

11         21.    Defendant transacts business in this judicial District, is deemed to reside

12   in any judicial district in which it is subject to personal jurisdiction and because a

13   substantial part of the events establishing the California claims at issue here giving rise

14   to the claims alleged herein occurred or arose in this judicial District.

**THE PARTIES**

**Plaintiff**

17         22.    Plaintiff Miguel Porras resides in the City of Burbank in Los Angeles

18   County and is a citizen of the State of California.  He is a Sergeant in the Glendale

19   California Police Department where he has served for 27 years.

20         23.    In or around September 2014, Sergeant Porras selected a PBBA Elite

21   (AXII) vest for purchase through an in-person meeting at his patrol building with a

22   PBE manufacturer's sales representative.  Prior to purchasing the vest, Sergeant Porras

23   researched features, weight, and other aspects of Point Blank's concealable vests

24   online, including on PBE's website (and pricing on the website of one of its authorized

25   distributors), and was exposed to Point Blank's marketing materials, including PBE's

26   product catalogue which included the Elite vest, PBE's sales specification sheet for the

27   Elite vest he purchased, Frequently Asked Questions about the Elite vest, and other

28

advertisements.   Among other representations, the marketing materials represented that:

- the SSBS was "highly-effective," provided "optimal protective coverage," prevented, "the rolling or sagging of the ballistic panels inside the carrier" and maintained "the coverage of the ballistic panels," all for a duration of "throughout the life of the vest," which is at minimum, five years;

- the vest and SSBS had a "five-year lifecycle" and that "zero compromises were made in performance or comfort;"

- a feature of the SSBS was its ability to be disconnected daily for "easy doffing and donning" and additionally, for "adjustment," and that it was durable enough for that use; and

- "there has never been a more advanced form of body armor."

Sergeant Porras believed and relied upon Defendant's representations in purchasing his vest.

24.   Defendant never disclosed any limitations on the use of the SSBS, any defect or any of the problems with the SSBS raised in this suit at any time, including in any of its marketing materials or otherwise.  The defects were substantial, posed a safety hazard, and Defendant had a duty to disclose them to all purchasers.

25.   Had Defendant disclosed in its marketing materials published on its website or those disseminated to and through its sales agents, distributors or otherwise that the vest had a defective SSBS, or that he would continually experience the vest sagging down or the SSBS falling apart in the line of duty, Sergeant Porras would not have purchased the vest.

26.   The SSBS in Sergeant Porras' vest failed within approximately one year. When the SSBS failure occurs in the line of duty, the vest comes apart at the SSBS shoulder connection, falls down inside his uniform and cannot be worn.  When that happens, Sergeant Porras has to stop what he is doing while on duty, find a safe place, remove his uniform and attempt to reattach the failed SSBS connection(s).

CLASS ACTION COMPLAINT

27.     The Glendale Police Department has a mandatory wear policy, as do the overwhelming majority of all law enforcement agencies in California and across the country.  Sergeant Porras is not permitted to go on a single shift without wearing his vest and must continue to wear his vest.  Consequently, Sergeant Porras has been forced to use self-help measures to prevent his vest from falling apart because of the SSBS failures.

28.     Sergeant Porras is required to purchase a new vest every five years. Sergeant Porras would purchase another SSBS Vest in the future if the defects and resulting problems were in fact fixed.

29.     Sergeant Porras reasonably expected that Defendant would stand behind its products and the SSBS for the five-year period of the warranties and would not have purchased the vest had he known Defendant would not do so.

30.     The vest was manufactured at PBE's facility in Pompano Beach, Florida on or about September 29, 2014.  It was later shipped by PBE from Pompano Beach directly to Sergeant Porras via PBE Packing Slip No. IF-1162498.  Sergeant Porras purchased the vest for $940.00.  He subsequently received the vest in October 2014.

31.     At all relevant times, Sergeant Porras wore and used his SSBS Vest in the normal and ordinary course of his law enforcement duties, in a manner that was consistent with the how the vest was supposed to be worn and used.

32.     PBE provided five-year express warranties to Sergeant Porras for his SSBS Vest, including on the SSBS.

33.     The vest has manufacturing and material defects, is defective in design and is otherwise defective.  It has fallen apart and poses a life-threatening safety issue. It cannot be worn without self-help measures to hold the vest together.

34.     Sergeant Porras' counsel notified PBE about the breaches of warranties and defects in SSBS Vests sold to consumers throughout California as early as March 30, 2017, through an in-person meeting with PBE management and its counsel in April 26, 2017, by subsequent letter dated July 14, 2017 (including specific notice

1  of violation of California consumer protection laws), through the filing of a lawsuit in
2  October 2017, and otherwise thereafter.  Defendant was also otherwise informed that
3  purchasers across the country, including purchasers throughout California, were
4  experiencing failures of the SSBS as early as within the first year, and that new
5  replacement shoulder straps do not fix the problem.

6  **Defendant**

7  35.    PBE is a Delaware corporation with its principal place of business and
8  manufacturing facility at 2102 SW 2nd Street, Pompano Beach, Florida 33069.  It is
9  registered with the California Secretary of State to transact business in California and
10  its registered agent for service is CT Corporation System.

11  36.    At all times relevant herein, PBE has engaged in the business of
12  manufacturing, marketing, warranting, distributing, and selling the SSBS Vests, among
13  other activities, in California.  PBE manufactures the SSBS Vests at issue in this
14  litigation through wholly-owned subsidiaries and/or brand names, including Point
15  Blank Body Armor, Inc. ("PBBA") and Protective Apparel Corporation of America
16  ("PACA")

17  37.    Although Defendant has operated under different names at times, PBE
18  advertises and represents all purchasers of its SSBS Vests in California that it has
19  continuously been in business as the same company manufacturing body armor
20  "since 1973."

21  **FACTUAL ALLEGATIONS**

22  **The SSBS Vests**

23  38.    Five years is the typical useful life for ballistic panel systems in
24  concealable vests and the industry-standard warranty period, while the carriers are
25  typically warranted for 2 years.  The ballistic panel systems can be removed from the
26  carrier of most concealable vests so that a carrier can be dry cleaned or otherwise
27  washed.  It is not uncommon for a carrier to become stained, sweat-soaked, or worn

28

1  out and be replaced one or more times during the five-year useful life and warranty

2  period of the ballistic panel system.

3    39.    PBE supplies five-year written warranties (discussed more fully below)

4  covering the SSBS and ballistic panel system, and a separate two-year written warranty

5  for the carriers of its SSBS Vests.

6    40.    At all relevant times, Defendant has represented and advertised to all

7  purchasers throughout California that it manufactures and sells four models of

8  concealable SSBS Vests under its PBBA brand – the Standard, Hi-Lite, Vision, and

9  Elite (**Exhibit A** hereto),[2] and only three models of concealable SSBS Vests under the

10  PACA brand name – the Standard, Perform-X, and Blue Steel (**Exhibit B** hereto).

11    41.    However, the *PBBA Standard* model is identical to the *PACA Standard*

12  model (other than the name/logos), the *PBBA Vision* model and the *PACA Blue Steel*

13  model are identical (other than the name/logos), and the *PBBA Hi-Lite* model and the

14  *PACA Perform-X* model are identical (other than the name/logos), such that each pair

15  of models are the same exact vest simply marketed under two brand names.  Other than

16  in name and visual format, Defendant's detailed model specification "Sales Sheets" for

17  each pair of vests, marketed to all purchasers in California and published on its website,

18  are also verbatim or nearly verbatim for both models in each respective pair.  And,

19  Defendant's state contracts, pricing lists, and other documents designate the Standard

20  vest, regardless of brand, as the same vest, the Vision and Blue Steel vest as the same

21  vest – VISION/BLUE STEEL, and the Hi-Lite and Perform-X vest as the same vest -

22  HILITE/PERFORMX.   In other words, at all relevant times, Defendant has actually

23  manufactured and sold only four PBBA and PACA concealable model vests that

24  contain the SSBS – the Standard, Hi-Lite/Perform-X, Vision/Blue Steel, and the Elite.

25

26

27

28  _____
[2] The Python and Executive concealable vests are not SSBS Vests.

42.     Regardless of the model, the SSBS in all SSBS Vests is identical or substantially identical, suffers from the same defects, and is subject to the same warranties, misrepresentations, and omissions.

43.     The fact that these vests are available in different sizes and available in different color carriers (tan, navy, black, white, etc.) or that they are made for males and females, or that the carriers can be customized to add a loop for a radio microphone or a special name tag does not change the fact that Defendant only manufactures four models of PBBA and PACA concealable SSBS Vests.  These options have nothing whatsoever to do with the SSBS and the defects causing its premature failure.  As indicated herein, the SSBS defects in Plaintiff's and all Class Members' vests are uniform and manifest in all SSBS Vests at the manufacturing line.

44.     At all relevant time periods, the SSBS in all of these concealable models was identical or substantially the same (and Defendant has so represented in marketing materials, press releases and otherwise, including to governmental entities and State purchasing agents).  In fact, Defendant has represented to all purchasers in California as recently as January 2018 that the SSBS straps and clamps are identical in not only all concealable SSBS Vests but in all of Defendant's other non-concealable vests containing an SSBS as well (tactical, correctional, SWAT, etc.).

45.     Defendant has manufactured and sold thousands of SSBS Vests in California during the relevant time periods for use by police officers and others at prices in the average range of $700.

46.     Defendant's marketing materials and sales information on SSBS Vests, including those to which Plaintiff was exposed, were uniform.  More specifically, Defendant's yearly product catalogues, Sales Sheets, website material, product press releases and more during all relevant times were identical or substantially identical (format or layout might differ). This information was utilized by Defendant's sales staff and "global distribution network" to promote SSBS Vests.  This was confirmed by

Irene Chung, head of PBE's marketing, who testified on June 12, 2018 that all of PBE's marketing strategies are the same for all vests:

> [Q.]   Are there different marketing strategies for vests that have an SSBS system and those that do not?
> [A.]   No.

Ms. Chung also confirmed that the marketing catalogs and other materials were the same, and were distributed nationwide:

> [Q.]   How is this sort of document used by Point Blank?
> [A.]   We provide catalogs for our distribution…
> [Q.]   So is this the sort of document that would go to the distributors just to educate them about the product different from the price list?
> [A.]   Our distributors as well as police officers, the end-user.

Ms. Chung additionally testified that all of PBE's marketing of SSBS Vests was nationwide.

> [Q.]   It is marketed nationwide?
> [A.]   Yes.

She further acknowledged that all press releases are distributed nationwide.

> [Q.]   Just so we understand how it works, when you do a press release, that's distributed nationally; correct?
> [A.]   Yes.

Lastly, Ms. Chung testified that PBE's Care & Maintenance Manual is uniform and shipped with every SSBS Vest.

> [Q.]   Now, is this also on the website?
> [A.]   Yes.
> [Q.]   And it's also enclosed -- it is enclosed in each box that you ship nationwide of these vests to purchasers around the country?
> [A.]   Yes…
> [Q.]   [H]as the document remained basically the same over time in terms of, you know, the do's and don'ts of body armor?
> [A.]   I would say so.

47.   Defendant broadly disseminated its uniform marketing materials throughout California, including but not limited to, through press releases (typically through PRNewswire), through law enforcement publications, through its website, and through an extensive distributor network, which in turn have additional prolific online presence and distribute print materials in retail law enforcement supply stores throughout California and directly to law enforcement individuals and agencies.

1  During all relevant times, Defendant additionally provided uniform marketing content

2  and support to its sales agents and authorized distributors for downstream promotion

3  of SSBS Vests.

4  **The SSBS Is Uniformly Defective In Manufacture, Materials, Workmanship and Design, All Of Which Has Been Actively Concealed By Defendant.**

5

6      48.    Defendant at all times relevant to the matters herein, tightly controlled all

7  aspects of the design, manufacture, marketing, distribution, and labeling of the subject

8  SSBS Vests.

9      49.    At all relevant times, SSBS Vests were only sold directly by PBE or

10 through PBE sales representatives and authorized distributors, which PBE refers to as

11 "Point Blank's global distribution network."

12     50.    At all relevant times, Defendant did and continues to distribute, advertise,

13 market, and sell SSBS Vests in California for the stated purpose of protecting the lives

14 of those who wear them.

15     51.    All SSBS Vests manufactured by PBE, regardless of the make, model, or

16 threat level, include the same SSBS described herein and suffer from the same latent

17 defects.

18     52.    PBE's management has testified that all SSBS Vests were:

19 (i) manufactured at PBE's manufacturing facility in Pompano Beach; (ii) manufactured

20 pursuant to standardized specifications and construction; and (iii) shipped directly from

21 PBE into California to Class Members.  Specifically, Hoyt Schmidt, PBE's Executive

22 Vice President of Commercial Business testified on June 12, 2018:

23         [Q.]   [Y]ou have a standardize product?
           [A.]   Yes, they all build to our specifications.
24

25 Mr. Schmidt further testified:

26         [Q.]   All of the vests that you sell, all of the SSBS vests that you sold,
                  are manufactured in your Pompano Beach facility?
27         [A.]   Yes…
           [Q.]   All SSBS vests are shipped from Florida; correct?
28         [A.]   Yes.

53.     All SSBS Vests are defective and the defects exist from the time the vests leave the manufacturing line, in that the SSBS will fail while officers don and doff their SSBS Vests and/or during and from normal use over time even if the SSBS is not cycled daily (*i.e.*, even if purchasers do not don and doff their vests by disconnecting the SSBS).

54.     Each time the SSBS connection is cycled (engaged and disengaged), the SSBS deteriorates and weakens to the point where it does not have sufficient strength to securely support the weight of the vest when on an officer and falls apart, even though disconnecting the SSBS is its intended use.  Repeated disengagement of the SSBS straps from the c-clamps, whether by peeling or shearing, rapidly accelerates the weakening of the SSBS closure as does the introduction of moisture (*e.g.*, sweat or rain).

55.     Constant tension and pulling on the SSBS also results in failure, even where the SSBS is infrequently cycled, for example, to occasionally remove and clean the outer carrier of the vest (which requires disconnecting the SSBS).

56.     Substandard stitching of the c-clamps to the ballistic panels also causes a system failure of the SSBS as rapidly as within a few months.

57.     For example, an officer whose vest fell apart while he was on foot patrol at the 2016 Republican National Convention in Cleveland explained the defects this way:

> [T]here's a cancer in this vest . . . I was living my day -- day-to-day life with a –metaphorically, a medical condition built into this vest, manufactured in this vest from Point Blank.  It came out.  It could have cost me my life.

58.     That same officer called and wrote to Defendant's customer service representative and field agents for more than five months.  He requested PBE replace his vest.  PBE refused to do so and was otherwise unable to fix the problem.  As he explained the defect and resulting failure of his vest in a November 13, 2016 email to PBE's customer service agent:

> The black velcro parts are "sewn" into my ballistic panels. These are what I have to duct tape to the shoulder pieces because if not they do not hold my shoulder straps and my vest falls. I need new vest or new ballistic panels not new covers. I have been trying to fix this problem since July and it still has not been addressed.

Officers around the country and throughout California are experiencing the exact same problems and have reported them to Defendant.

59.     At all relevant times, PBE has represented and advertised in its marketing materials disseminated in California that a normal, customary manner of donning and doffing SSBS Vests is by disconnecting the SSBS.

60.     Defendant further represented and advertised in its marketing materials, on its website, and in news articles (including, for example, in the January 2014 edition of Law and Order magazine published throughout California) that disconnecting the SSBS to don and doff the vests was not only normal and appropriate, but that doing so was a preferred and "easy" method of donning and doffing its SSBS Vests and that officers, in particular females, often disconnect "one of the shoulder straps and remove the armor and carrier like a buttoned shirt - yes, to avoid dragging the armor over their face and hair."

61.     Despite those representations and advertisements, and unbeknownst to any purchasers, internally, Defendant's management knew (prior to the sale of all SSBS Vests at issue in this litigation) and has stated that the vests are not robust enough for that purpose. Defendant's representations and active concealment of that information are deceptive and unfair.

62.     At all relevant time periods, Defendant also posted a training video on its website demonstrating that the normal and appropriate method to disconnect the SSBS is by pulling or shearing, or a combination of pulling/shearing and peeling the SSBS connection apart.

63.     Throughout all relevant times hereto, Defendant knew and had documents showing that doing so will cause severe and rapid deterioration and failure of the SSBS

17

CLASS ACTION COMPLAINT

1  and has actively concealed that information from all purchasers in California, including

2  from Sergeant Porras.  Concealing that information was and is deceptive and unfair.

3      64.    At all relevant times, Defendant was aware that purchasers in California

4  would shear the SSBS connection to disengage it, and indeed, its own customer/officer

5  witnesses testified previously that they "grab the strap," "pull it off" and shear rather

6  than peel the SSBS, to disconnect it.

7      65.    Defendant has never warned any purchasers not to disconnect the SSBS

8  connectors (by shearing, peeling or otherwise), or that doing so would cause

9  accelerated and severe deterioration of the SSBS and its resulting unexpected,

10  premature failure.

11      66.    In addition to the failures of the hook and loop of the SSBS, prior to the

12  sale of all SSBS Vests at issue in this litigation and continuing throughout the relevant

13  time period, purchasers throughout the country and in California experienced system

14  failure of the SSBS because of substandard materials, workmanship and stitching

15  methods, and design that resulted in the entirety of the c-clamp portion of the SSBS

16  separating from the ballistic panels in the vests such that the vest cannot be worn.

17  These defects are also substantial and occurred in many instances as early as within a

18  few months of use.

19      67.    Early on before the relevant class period, the SSBS models used elastic

20  shoulder straps.  Users reported problems with those SSBS models, including that the

21  elastic permanently stretched and resulted in failure of proper ballistic coverage, fit,

22  and other associated problems.  As a result, and again before the relevant class period

23  (approximately 2004-2007), Defendant switched to more robust, higher-quality, and

24  higher-cost components of the SSBS that provided better connectivity, including larger

25  and longer genuine Velcro "hook" clamps sewn in the ballistic panels, as well as

26  thicker, elastic, and edge-stitched shoulders straps.  The straps were made in-house by

27  PBE and had real counterpart "loop" Velcro.  Figure 6 below shows an example:

28



FIGURE 6

68.     To lower costs and to shed weight so that it could advertise its vests as "lower profile" and among the lightest and thinnest in the marketplace, in approximately 2007, Defendant jettisoned the higher quality more robust components and switched to less expensive, lower quality materials for the SSBS components, including using outsourced Breathe-O-Prene[3] straps as part of its SSBS that do not have the traditional counterpart "loop" to connect to the "hook" tabs sewn into the ballistic panels.

69.     Subsequently, Defendant continually reduced the amount of material used in the SSBS components, including reducing the size and length of the square Velcro connection clamps (shown in Figure 6 above) to the current smaller rounded c-clamps (shown in Figures 2, *supra*, and 8, *infra*) used at all relevant times hereto.

70.     Reducing the size and surface coverage of the "hook" Velcro portion of the SSBS sewn into the ballistic panels exacerbates the problems by decreasing the peel and shear strength of the connections and thus, increases the likelihood and immediacy of failure of the SSBS.  Defendant was aware, internally, through customer complaints

---

[3] Breathe-O-Prene is a registered trademark of Accumed Corp.

CLASS ACTION COMPLAINT

and returns, internal documents, and through other sources of these and other problems and defects in its SSBS prior to the sale of all SSBS Vests at issue in this litigation.

71.    In further efforts to reduce costs and shed more weight, Defendant later reduced the thickness, density, and amount of Breathe-O-Prene in the SSBS straps.

72.    Sacrificing officer safety for profit still further, Defendant ceased using genuine Velcro and genuine Breathe-O-Prene, switching instead to knock-off versions from China at less than half the cost.

73.    For the SSBS Vests at issue, PBE originally used Breathe-O-Prene in the SSBS straps but switched to the Chinese imitation material to save money.

74.    Neither the Breathe-o-Prene nor the Chinese imitation material were as effective as the Velcro originally used in the SSBS, as laboratory data demonstrates that both materials are inappropriate for use and rapidly fail when the SSBS is used as intended.

75.    Similarly, early in the class period, Defendant used Velcro for the c-clamps of the SSBS, but to save money, Defendant switched to the Chinese imitation Velcro "hook" clamps sewn in the ballistic panels for the c-clamps.

76.    As Defendant made these decisions to change materials for the SSBS, the change was uniform among SSBS Vests, and regardless of which material the SSBS Vests are made of, the SSBS is substantially the same and is defective for the same reasons.

77.    As a result of these profit and marketing measures, Defendant exacerbated the latent defects in the SSBS and has experienced reported failures of the SSBS in California and nationwide.

78.    As of this filing, Defendant still represents in its yearly product catalogs, Care & Maintenance Manual, vest specification sheets, on its website, and in other marketing materials in California that it is using genuine Velcro for the c-clamps and genuine Breathe-O-Prene for the SSBS when in fact it does not. Those advertisements are knowingly false. Defendant's management has testified they are false, that "it's

CLASS ACTION COMPLAINT

1    definitely not Breathe-O-Prene" and that it never disclosed the truth to any purchasers
2    (including its largest customers - federal, state, and local law enforcement departments)
3    that the vests contain a Chinese-made imitation product.  Defendant's conduct in this
4    regard was and is deceptive and unfair.

5        79.    At all relevant times and prior to the sale of all SSBS Vests at issue in this
6    litigation, PBE knew this premature failure of the SSBS should never happen and, in
7    fact, represented in marketing materials, including a brochure posted on its website and
8    used by its sales representatives and distributors titled, "NIJ 0101.06 Standards and its
9    Impact on Law Enforcement," that it was "critical" that "all armor materials should be
10   robust enough to handle different wear and climate conditions."[4]

11       80.    At all relevant times, Defendant's marketing materials also uniformly
12   warrant for all SSBS Vests that the SSBS should last "throughout the life of the vest."[5]

13       81.    At all relevant times and prior to the sale of all SSBS Vest in this litigation,
14   PBE had extensive knowledge of this defect from its own studies and surveys, from
15   reports from its own research and design personnel, from the severity and consistency
16   of the problems reported from its field representatives, from consistent complaints from
17   purchasers (including repeat complaints from purchasers), and otherwise.

18       82.    PBE was unable to fix these defects, has never disclosed to purchasers that
19   it knew these SSBS defects to be a severe problem, and that is was and is unable to
20   provide a permanent in-warranty fix.

21       83.    The SSBS contains defects in manufacturing, material, workmanship, and
22   design, fails, and results in SSBS Vests posing a life-threatening safety risk to end
23   users.

24
25   [4] The NIJ does not certify the SSBS in an SSBS Vest and therefore it is Defendant's
     responsibility to achieve these "robust" goals.
26   [5] The manner in which purchasers care and store their vests has nothing to do with the
     latent defects and resulting SSBS failures, and Defendant has represented that all of its
27   materials should be "robust enough" to handle different user conditions. Additionally,
     as discussed below, any after-the-fact disclaimers as to care and storage are
28   inapplicable to all purchasers here.

84.     Defendant has knowingly manufactured and sold the SSBS Vests with the defective SSBS, while willfully concealing the true inferior quality, sub-standard performance, and other defects causing failure of the SSBS.

85.     Defendant failed to notify Plaintiff and any Class Members of the defects prior to their purchase of SSBS Vests.

86.     Beginning in January 2018, in further effort to cover-up the defective SSBS in its vests and in response to the litigation filed in the Southern District of Florida, PBE, over the signature of its Executive Vice President for Commercial Business, Hoydt Schmidt, published throughout California and nationally, knowingly false and deceptive information as to the performance and effectiveness of the SSBS. The published information deceives consumers and affirmatively conceals the known latent defects in the SSBS Vests so to maintain existing sales and induce continued sales of the vests.  By way of more specific examples regarding these published statements:

(a)     Defendant knowingly and falsely stated that it "rigorously" tested the SSBS when in fact it did not.

(b)     Defendant also falsely represented that a consultant "confirms that Point Blank's SSBS vests are durable, safe, and comply with Point Blank's representations and warranties," when in fact the consultant had not and had never even seen a SSBS Vest other than a photograph.

(c)     Defendant further falsely represented that the consultant confirmed that the SSBS "straps simply will not detach from the bird's mouth even after extensive use and aging" when in fact the consultant had not.

(d)     Defendant's representations were based on supposedly rigorous and proper testing, which in fact was not true.  And, the testing that was performed was on SSBS components, as opposed to SSBS Vests.

(e)     Defendant represented that all of its SSBS Vest models were safe and effective as a result of supposed testing as well as from purposefully-

22

limited testing of SSBS components designed to achieve a non-standard result.

(f) Furthermore, the SSBS components that were tested were not the knock-off Chinese materials currently being used in Defendant's SSBS Vests, rather Defendant's representations were based on testing of real Velcro and Breathe-O-Prene SSBS components not actually used.[6]

87.     The uniform defects in SSBS Vests and Defendant's common pattern of concealing material information, its common pattern of purposeful avoidance and its common pattern of affirmatively providing false and misleading representations regarding the SSBS are material, pervasive, deceptive, and unfair.

88.     That the information Defendant concealed about the SSBS, and that the information it affirmatively misrepresented about the SSBS were a substantial factor in influencing Class Members' decision to purchase SSBS Vests (including the nation's largest contracting and purchasing agents), is readily demonstrable.  Indeed, Nikki Pollack, the State Procurement Administrator for Colorado (the Lead State for the National Association of State Procurement Officials ("NASPO") Master Contract for body armor), a group that negotiates the contracts for purchase of body armor (and

---

[6] Defendant has a history of misrepresenting the safety and durability of its vests.  In the summer of 2004, concerns arose in the marketplace over use of "Zylon" material in ballistic vests, Point Blank did not have any returns claiming failure of any of the several hundred thousand vests it sold containing Zylon fiber.  In response to the concerns, as well as independent testing showing problems with its Zylon vests and a lawsuit over those vests (including by certain of the undersigned counsel), Point Blank's then parent company issued a glossy "Safety Report" that – just like PBE's current press releases and purposefully misleading reports issued here – claimed "We discovered no safety issues with Zylon® (PBO) hybrids manufactured by Point Blank and PACA as a result of this testing."  The report turned out to be false and a whitewash based on flawed/myopic testing (exactly as here), and later became a centerpiece of the Justice Department's False Claims Act case against the company.  "NIJ has now completed ballistic and mechanical properties testing on 103 used Zylon®-containing body armors provided by law enforcement agencies across the United States. Sixty of these used armors (58%) were penetrated by at least one round…" Contrary to Point Blank's claim that no issue existed with any of its vests, all but two failed the NIJ's testing.  In the end, the correct broader range of tests performed by plaintiffs in that suit, testing performed by NIJ, and internal tests Point Blank concealed, all revealed the polar opposite of Point Blank's published "Safety Report."

determines whether SSBS Vest are included in those contracts) for twenty-six states, recently testified after reviewing just a small fraction of the concealed documents: "If I was aware of the problem, I certainly wouldn't continue to buy the product."  She additionally testified,

> [Q.]   Do you believe that you were kept in the dark -- on a fair amount of information that would have been material to you?
> [A.]   Based on what I've seen today and the information that I've received regarding the vests and the lawsuit, there's a significant amount that I was not provided with, yes.

Ms. Pollack further testified,

> [Q.]   Do you believe that law enforcement officers should be entitled to see and review the information that you've seen today and earlier this morning when making a decision on purchasing a life-critical product?
> [A.]   If I were an officer, I'd want to see it, yes.

She also testified,

> [Q.]   And as a person making a decision on whether to authorize certain models of vests to be on a list to be sold in your state and potentially others, you would have wanted to see all of this information beforehand; is that fair?
> [A.]   I would want to provide all the information that is available on the product to the customer and let them make an informed decision about whether or not they want to purchase the vest.

89.   To this day, Defendant continues to deliberately and proactively conceal the true characteristics, performance, qualities, limitations, known defects, and failures of the SSBS from all purchasers and users of SSBS Vests in California, including the specific documents and information reviewed and discussed in the preceding paragraph.

90.   Defendant's false representations made in California were uniform, were made to induce sales, and are quintessentially false, misleading, and deceptive.

**Vests That Cannot Be Properly Worn Create a Critical Safety Hazard**

91.   When SSBS Vests fail, they cannot be worn without replacement or self-help measures such as duct tape, safety pins, etc.

92.   Both the National Institute of Justice ("NIJ") and Defendant publicly state that a vest cannot protect an officer's life if it cannot be properly worn.

24

93.     In fact, Defendant warns in the Care and Maintenance Manual provided to every purchaser after the sale in the box with the vest that the vest "can help reduce the risk *of fatal injury* only if you wear it."  (emphasis added).

94.     Fully acknowledging the safety hazard presented by a SSBS that does not work properly and unexpectedly fails in the line of duty, Defendant further represents to all purchasers in the Care and Maintenance Manual that if the panels do "not stay in position" they must be replaced (not sent in for repair, not duct taped, but "replaced"). The SSBS Vest "*has to be worn properly* in order for it to function as designed … make sure that the ballistic panels *are in the proper position* within the carrier and that the *suspension straps are properly engaged*.  Armor that … *does not stay in position* within the outershell, *should be replaced*."  (emphasis added).

95.     Here, the ballistic panels do not stay in "proper position" and the straps do not stay "properly engaged" because the SSBS Vests suffer from defects in manufacturing, material, workmanship, and design resulting in the SSBS prematurely failing.

96.     Compounding the problem, even where repairs are attempted (as opposed to replacement as recommended by PBE, but which PBE refuses to honor), there is no method to repair a failed SSBS in the field or without returning the vest to PBE's manufacturing facility.

97.     Equally problematic and further highlighting the failure of essential purpose and futility of attempted repairs, PBE's standard repair time is between two weeks and one month.

98.     However, the overwhelmingly majority of law enforcement agencies in the United States (and all agencies that accept federal funds) have a mandatory wear policy and thus, officers may not go on a single shift without their vests, let alone weeks on end.

99.    Consequently, the majority of purchasers experiencing failures of the SSBS in California and around the country turn to, and continue to be forced to turn to, self-help methods, including duct tape, electrical tape, safety pins, and other methods to hold their vests together and address the safety hazard from the SSBS failure. Figures 7, 8 and 9 below show a few examples.



FIGURE 7                 FIGURE 8



FIGURE 9

100.    PBE has received, but concealed, extensive and alarming complaints from law enforcement personnel spanning the entire country.    PBE received multiple

complaints on a monthly basis[7] which expressly informed PBE of the exact same common defects raised by Plaintiff and notified PBE that users were concerned for their safety, that the failures continue to occur in the line of duty and as soon as within a year, and that replacement straps do not correct the problem.  Examples of these complaints from law enforcement officers in California, Missouri, Nevada, New Jersey, New York, and West Virginia are below:

- August 4, 2017: "Hello, this is the second time I've tried contacting someone there.  I am a State Trooper with the Nevada Highway Patrol.  I currently wear the Point Blank Vision [v]est and have for about four years.  I have been having problems with the shoulder Velcro straps not sticking, *causing the vest to literally fall apart while wearing it during my shift*, causing not only discomfort in the field but *an unsafe situation* with the vest falling down.  It also takes me extra time before shift to try to get the strap to stick as it will fall apart as i don it, so i have to don it very carefully and not put weight on it … I'm stuck in a tough situation now because my department will only purchase a new vest every five years and I can't afford to pay out of pocket, but this vest is unsafe to use as is…" (emphasis added)

- September 12, 2017: "I am a police officer with the La Mesa Police Department … (San Diego County) … new point blank vest for less then 2 years and the Velcro straps are already not working.  The Velcro straps are folded up, don't stick to the vest and are becoming unusable."

- September 16, 2017: "About a year ago I made contact with someone with your company about shoulder straps not holding and had the Velcro replaced, I believe that the same issue is happening again, wondering what I could do?"

- September 19, 2017: "I have an issue regarding the Velcro straps on my vest.  The "clam shell" design that holds the straps in place seem to have failed completely.  I have been forced to use duct tape and safety pins to keep it held together.  I would like to have this fixed and did not want to take it to an outside source due to the fact that the Velcro is attached directly to the vest."

- November 12, 2017: "I have a Elite vest I purchased about two years ago or more … The Velcro on both panels are failing and the ballistic panel is tearing the corners of the vest carrier.  I spent over $1100.00 on this set up and I don't I should be seeing these problems so soon."

- December 5, 2017: "Hi my name is Katherine, I am an officer for the NYPD and was issued a vest.  However, I have under a year with the vest and already the velcro straps have broken."

---

[7] In addition to never informing Class Members about the defects, PBE did not formally maintain records of complaints until mid-2017.  Once it began maintaining complaints, they came in on a monthly basis.

- April 22, 2018: "My name is [   ] and I am a Denver police officer.  I have point blank body armor and the Velcro straps keep coming undone.  Several times a shift they fail.  I was wondering if you have any remedy for this problem.  Several others I work with are having the same issue."

- May 21, 2018: "Hello, my vest is was purchased roughly a year ago, my shoulder straps (neoprene velcro?) have lost the ability to adhere in the available velcro slots."

- June 5, 2018: "Concealable Carrier's Shoulder Straps need to be more durable to hold onto velcro (hook portion)"

- June 9, 2018: "Velcro straps stops holding *after a few months*." (emphasis added)

101.   None of this information was ever disclosed by PBE to Plaintiff or Class Members and, as discussed herein, is information directly contrary to material misrepresentations PBE actually made about the known dangers of the SSBS Vests, as well as facts PBE had a duty to disclose, but actively suppressed.   Moreover, PBE ignored these complaints and continued to manufacture and sell its SSBS Vests, misrepresenting the quality, characteristics, and efficacy.   Additionally, PBE had superior, indeed exclusive, knowledge of the latent defects in the SSBS, which were not known to Plaintiff and Class Members.

**Laboratory Testing of New and Used SSBS Vests**

102.   Laboratory test data on new and used SSBS Vests performed at Clemson University's Department of Materials Science and Engineering confirms that the SSBS will not properly perform and maintain its integrity for its warranty period.   The laboratory test data results confirmed that if a new SSBS Vest is donned and doffed by disconnecting the SSBS closure (regardless of whether by shearing or peeling), the strapping system weakens to a point where the closure does not have sufficient strength to securely support the weight of the vest when on an officer.

103.   Furthermore, the laboratory test data, including the test data on used vests, shows that the SSBS will prematurely deteriorate and is prone to fail within the warranty period even if the SSBS closure is not engaged and disengaged daily to don and doff the vests (*i.e.*, the vests are donned and doffed by lifting them overhead) and

only disengaged and engaged occasionally so that the carrier can be removed and laundered.  Put differently, the normal constant and daily tension and tugging placed on the SSBS closure over the useful life of the vest can and will cause it to fail.

104.   In fact, Sergeant Porras did not don or doff his vest by engaging and disengaging the SSBS daily.  Rather, he donned and doffed his vest over his heads without disconnecting the SSBS, yet the SSBS in his vest still failed early within the five-year warranty.

105.   The raw data shows the problem is exacerbated by the presence of moisture (simulated sweat solution) where the initial and subsequent strength results are reduced significantly compared to ambient, dry conditions.

106.   The unembellished raw test data also confirms a substantial drop-off in performance over just 100 shear tests (5 months of donning and doffing using a minimum of only once per day, five days a week) losing over 85% of initial shear strength.

107.   Given that the weight of SSBS Vests are approximately 5 pounds, once the shear strength drops to this level, after approximately 75 shear tests, the closure is at failure, will not support the weight of the vest and will not keep it from falling down at the connection.

108.   Similarly, the test data results confirm a substantial drop-off in performance over just 50 peel tests per side of the SSBS closure system (approximately 2.5 months of donning and doffing by disconnecting the SSBS using a minimum of only once per day, five days a week) losing approximately 50% of initial peel strength.

109.   The laboratory data starkly contrasts with Defendant's advertisements, representations, and warranties as to what the performance capability of the SSBS should be – that purchasers should be able to cycle the SSBS connection twice daily for easy "doffing and donning" for five years.

110.   One of the mechanisms of the failure is shown by the following microphotographs in Figures 10 and 11.  Upon repeated connecting and disconnecting of the SSBS connections, the plastic-like hook material in the SSBS clamps pulls out one end of loop fibers from the strap matrix (far from being robust, there is only a very thin layer of loop on an SSBS strap).  In doing so, the loop is not available to engage the hook, to prevent it from just sliding off one end, upon the next closure.  As shown below in Figure 11, the loops are generally broken from the strap matrix and visibly appear straightened.



FIGURE 10                              FIGURE 11

111.   PBE has long known that the SSBS prematurely fails, with or without repeated disengagement of the SSBS closure, and has concealed and ignored internal documents showing same, including regular and consistent complaints from officers all across the country.

112.   PBE has also concealed from all purchasers internal documents detailing the normal and expected cycling (repeat daily disconnecting and reconnecting) of the SSBS the company expected during the five-year warranty period of the SSBS.

113.   Prior to the purchase of all vests at issue in this litigation, PBE knowingly failed to disclose the fact that its SSBS Vests suffer from serious latent manufacturing, material, and workmanship defects, namely that the SSBS connection holding the vest

in place fails prematurely and unexpectedly, rendering the vests unwearable. Instead, PBE warrants the SSBS to be "highly-effective," as providing optimal protective coverage, as preventing the rolling or sagging of the ballistic panels inside the carrier and as "maintaining the coverage of the ballistic panels," all for a duration of "throughout the life of the vest," which is at minimum, five years.

**The Reported Failure Rate Exceeds 10%**

114.    Given that a ballistic vest is a safety product, Defendant's consultant indicated that a failure rate of 10% would be an obvious "red flag."

115.    All SSBS Vests have the same uniform latent defects that are manufactured into and manifest in every vest (start ticking so to speak) at the manufacturing line. Purchasers have reported failure rates in the line of duty in excess of 10% within their agency and as high as 60%. By way of specific example, in August 2018, the Ohio State Troopers Association reported that in excess of 10% of overall members who purchased SSBS Vests (and 60% of respondents to a letter requesting whether they had experienced failures of the SSBS in the line of duty) reported failures.

116.    There is no adequate fix for the latent material, manufacturing, workmanship, and design defects that exist in PBE's SSBS Vests.

117.    PBE's Care and Maintenance Manual warns, "DO NOT attempt to repair the garment yourself." Similarly, NIJ standards and guidelines warn end users to "[n]ever attempt to repair armor panels under any circumstances" and that "the covers of the armor panels should not be opened for any reason."

118.    Providing additional sets of shoulder straps does not fix the defects in the SSBS Vests, nor does replacing the c-clamps with the same defective material. Laboratory test data demonstrates that new straps placed in a used clamp will either not work properly from the start or exhibit an even more severe degradation than a new strap/new clamp combination. Put differently, laboratory testing confirms that replacing a defective strap with another defective strap is not an adequate remedy. PBE

1   knew that lab testing of a new strap in a used vest reveals this accelerated deterioration
2   but affirmatively concealed this information from all purchasers and continued selling
3   its defective SSBS Vests.

4       119.   Because the SSBS is a component of, and incorporated into, the ballistic
5   panel system, when it wears out or otherwise fails (as is happening as soon as within a
6   few months) PBE has no non-destructive permanent fix for purchasers to implement in
7   the field.

8       120.   Furthermore, while PBE's warranties are not limited to repair or
9   replacement, a purported remedy of "repair" fails of its essential purpose and is
10  unconscionable because: (i) the defects in the SSBS Vests are latent and not
11  discoverable on reasonable inspection; (ii) Defendant was aware of the problems with
12  the vests; (iii) there is no indication that Defendant can repair the latent defects; (iv) the
13  length of time Defendant admits it takes to attempt a repair (two weeks to a month)
14  coupled with mandatory wear policies governing officers, effectively prevent
15  attempted repair from being a true remedy or option - officers cannot go on duty
16  without their vests for one shift let alone weeks; and (v) Defendant's repeated efforts
17  to stop the SSBS failures, have been unsuccessful; thus, they deprive Class Members
18  of the substantial value of their bargain, leaving them without a remedy.

19  **Warranties**

20      121.   PBE made express representations and warranties regarding the SSBS
21  Vests to Plaintiff and Class Members that were part of the basis of the bargain.

22      122.   Defendant made certain express warranties regarding the qualities and
23  performance characteristics of all SSBS Vests.

24      123.   Defendant provided an express warranty to Plaintiff and all Class
25  Members on the labels on the face of the ballistic panels of which the SSBS is a part
26  (directly integrated/sewn into) that warrants, "Warranty Period: 5 Years."   Two
27  photographic examples of this express warranty are below:

28

This express warranty is not ambiguous.  It does not have *any* limitations, conditions, precedent, or exclusions.  It does not have *any* strings attached.  It does not limit the warranty to repair or replacement or to only some fractional portion of the ballistic system to which it is affixed.  It does not require *any* inspection by Defendant *or* return of the product to Defendant.  It does not state that use of duct tape, electrical tape, or safety pins voids the warranty.  Rather, *it is a straightforward unconditional warranty for 5 years*.

124.   Additionally, after every sale, all SSBS Vests came with a Care and Maintenance Manual containing terms of certain additional express warranties provided by PBE directly to Plaintiff and Class Members, and a Warranty and Customer Response Card from PBE which Class Members were asked to return directly to PBE.  A copy of the Care and Maintenance Manual is attached as **Exhibit C** hereto.[8]

125.   The express five-year warranty in the Care and Maintenance Manual further provides:

> Point Blank Enterprises warrants the ballistic panels for a period of five (5) years against manufacturing defects.

---

[8] PBE otherwise instructed all purchasers to directly interact with it.  For example, another provision of the warranty (for tears in the ballistic panel cover) instructs purchasers to return their vests to Defendant - "Should the soft body armor ballistic panel cover be compromised (cut, torn or frayed); it should not be worn and immediately returned to the manufacturer for inspection and repair."

The SSBS is a component of the soft ballistic panel system of an SSBS Vest and is not in any way part of the outer carrier system.  The above warranty is not limited to part of the ballistic panel, it is not limited to the ballistic panel cover, the ballistic fibers, the stitching, or any other component.  It is an unambiguous warranty covering the entirety of the ballistic panels, including the SSBS connectors sewn directly into the ballistic panels and tethered to the ballistic fabric.

126.   The five-year warranty in the Care and Maintenance Manual goes further and makes clear that the warranty covers all "components" of the ballistic system.  As discussed above, the SSBS is a "self-suspending *ballistic system*."  PBE expressly warrants all components of the ballistic panel system of its SSBS Vests for a five-year period:

> During the warranty period, *any* soft ballistic *component* having a manufacturing or material defect, as determined through inspection by an authorized Point Blank representative, will be repaired or replaced at no cost to the customer.

(emphasis added).  PBE's internal manufacturing schematics and instructions plainly refer to the SSBS clamp sewn into the ballistic panel as a component of the ballistic system and the "ballistic tab" or the "ballistic bird's mouth."

127.   PBE's express warranties in its Care and Maintenance Manual for all SSBS Vests are uniform, regardless of the particular model of SSBS Vest purchased and regardless of the purchaser.

128.   PBE made yet additional express representations and warranties regarding the SSBS Vests to Plaintiff and Class Members through its website advertisements and PBE's other sales and marketing materials.  In all of these materials, PBE consistently represented that the SSBS is a Self-Suspending *Ballistic* System (not a *carrier* system), warranted not only for the five-year period for "components" of the "ballistic system" but also warranted to "keep[] the ballistic panels completely suspended … throughout the life of the vest," which is at minimum the five-year warranty.

129.   More specifically, at all relevant times, Defendant warranted and represented on its website, in product catalogues and in other materials advertised throughout California and the country including to Plaintiff and all Class Members: [9]





---

[9] As set forth herein, these advertisements are false. PBE ceased using Breathe-O-Prene years ago. Even when it did use Breathe-O-Prene, laboratory data demonstrates that it too was inappropriate for use, defective in material and workmanship and rapidly fails. Recognizing the true effectiveness and durability of Breathe-O-Prene, Medicare authorizes payment for new Breathe-O-Prene straps for CPAP masks every 90 days.

130.   Defendant also warranted and represented to Plaintiff and all Class Members that the SSBS Vests (and all components thereof) would be free from defects in materials and workmanship and were merchantable and fit for their ordinary use.

131.   There are undisclaimed implied warranties that the SSBS Vests are merchantable and fit for the ordinary use for which they are sold.  Any purported language of disclaimer is not conspicuous, set apart, and otherwise does not legally exclude the implied warranties.

132.   Plaintiff and Class Members purchased their SSBS Vests either directly from Defendant or from one of Defendant's authorized representatives or distributors. Defendant's authorized representatives and distributors were not intended to be the ultimate consumers of the SSBS Vests.  Rather, Plaintiff and Class Members were also the intended third-party beneficiaries of the warranties associated with the SSBS Vests.

133.   Defendant has breached express and implied warranties in that, among other things, the SSBS Vests do not pass without objection in the trade, are unsuitable for the ordinary and intended uses for which they were sold and are not merchantable. The fact that they have been barred for sale in certain states is further indication that they are not merchantable.

134.   Defendant breached its express warranties by not providing a product with the benefits described in the labels and advertising and that is not free of defects in material and workmanship.  As a result of Defendant's breaches of its contracts and warranties, Plaintiff and Class Members have been damaged in the amount of the purchase price of their SSBS Vests.

135.   Any disclaimers of warranties due to alteration and modification of a vest are of no legal effect here.  Any such language in the Care and Maintenance Manual was not provided until after the sale of every SSBS Vest and until after the SSBS Vests were received.

136.   The same applies to any attempt to use language in the Care and Maintenance Manual to disclaim warranties because of how purchasers cared for and stored their vests.

137.   Defendant's attempted disclaimers were provided to Plaintiff and class members for the first time after the sale, and as a result, they are not binding.

138.   Additionally, use of self-help measures such as duct tape, safety pins, or similar efforts to support the SSBS connection is not an "alteration" or "modification" of the vest, but rather a "band-aid" or "stop-gap" measure.   Merriam-Webster's Unabridged Dictionary defines "alter" as "to make different in some particular, as size, style, course, or the like; modify."   "Modify" is defined as "to change somewhat the form or qualities of."   The form, size, style, and qualities are not in any way changed by such self-help measures.   The defective qualities remain what they are.   The definition of "band-aid" is "a makeshift, limited or temporary aid or solution." Similarly, the definition is "stop-gap" is "temporary substitute, makeshift."

**Damages**

139.   Sergeant Porras purchased a SSBS Vest that is defective and poses a safety hazard in that it has repeatedly failed, fallen apart, and cannot be safely used for protection.   Plaintiff and all Class Members have incurred a common injury, loss in value, and have not received the benefit of the bargain.   The SSBS prematurely fails resulting in the ballistic panels detaching from the shoulder straps.   This has occurred while he was on duty in the field.   Plaintiff purchased a SSBS Vest that fell apart within its warranty period and does not comply with the warranties because, among other things, the vest contains defects in materials and workmanship, is not suitable for its intended life-critical purposes and is not merchantable.   The vest physically could not be worn without duct tape, safety pins, or similar measures.

140.   Plaintiff's damages and the damages of all Class Members is the purchase price of the vest.

141.   Plaintiff and Class Members purchased SSBS Vests that do not provide the represented and warranted characteristics, are unsuitable for their ordinary use, are not merchantable, and present a significant safety hazard.

142.   Plaintiff and Class Members, as reasonable consumers, would not have purchased SSBS Vests had they known of the latent manifest defects in the SSBS in their vests that result in accelerated degradation and premature failure as described herein.

143.   Defendant's actions caused and continues to cause substantial injury to Plaintiff and other Class Members.  Plaintiff has suffered injury-in-fact and lost money as a result of Defendant's actions.

## TOLLING OF STATUTE OF LIMITATIONS

144.   On October 19, 2017 an action was filed by two of the nation's largest police unions and certain individual law enforcement personnel against Defendant in the Southern District of Florida.  *Ohio State Troopers Association, Inc., et al. v. Point Blank Enterprises, Inc*., Case No. 17-cv-62051 (S.D. Fla. 2017), sought to certify classes against Defendant for breaches of express and implied warranties (including on behalf of citizens of California), violation of consumer protection laws for unfair and deceptive trade practices (including on behalf of citizens of California), and injunctive relief.  For technical reasons that did not reach the substance or merits of the claims, on October 29, 2018, the court in that action denied the motion for class certification *without prejudice* and dismissed the action without prejudice for lack of subject matter jurisdiction over the individual plaintiffs' claims.  That action was re-filed on December 25, 2018 addressing the court's subject matter jurisdiction concerns and is currently pending.  The re-filed action does not assert any claims on behalf of citizens or consumers in California.

145.   The filing of that prior action tolled the statute of limitations for all claims by Plaintiff and all putative Class Members asserted here for the one year and ten days that action was pending.

**Fraudulent Concealment Tolling**

146.   Defendant has known of the defects in the SSBS Vests prior to when Plaintiff and all Class Members purchased their SSBS Vests, and yet has concealed from or failed to notify Plaintiff, Class Members, and the public of the full and complete nature of the defects in the SSBS Vests, even when purchasers have directly confronted Defendant about the failure of their vests in communications with Defendant, Defendant's customer service, and its sale representatives.   Defendant continues to actively conceal the defects to this day.   *See also*, ¶¶ 222 – 235, *infra*.

147.   As a result of Defendant's active concealment of vital information concerning the defects in the SSBS Vests, neither Plaintiff nor other Class Members could have discovered the defects and other problems with the Vests, even upon reasonable exercise of diligence.

148.   Despite its knowledge of the defects, Defendant failed to disclose and concealed, and continues to conceal, critical information from Plaintiff and the other Class Members, even though, at any point in time, it could have done so through individual correspondence, media release, or by other means.

149.   Any applicable statute of limitation has therefore been suspended or otherwise tolled by Defendant's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

**Estoppel**

150.   Defendant was and is under a continuous duty to disclose to Plaintiff and Class Members the true character, quality, and nature of the SSBS Vests.   Defendant actively concealed – and continues to conceal – the true character, quality, and nature of the SSBS Vests and knowingly made misrepresentations about the industry-leading quality, sophistication, state-of-the-art safety, and reliability of the SSBS Vests. Plaintiff and Class Members reasonably relied upon Defendant's knowing misrepresentations and active concealment of these facts. Based on the foregoing,

Defendant is estopped from relying on any statutes of limitation in defense of this action.  See also, ¶¶ 222 - 235, *infra*.

## UNJUST ENRICHMENT

151.   Plaintiff and the Class have conferred substantial benefits on the Defendant by purchasing defective vests that pose a safety hazard, and PBE has consciously and willingly accepted and enjoyed these benefits.

152.   Defendant knew or should have known that consumers' payments for its defective and harmful SSBS Vests were given and received with the expectation that the SSBS Vests were not defective, would not prematurely fall apart during the five-year useful life of the vests, and did not present a danger and safety hazard to them.

153.   Because of the fraudulent misrepresentations, concealments, and other wrongful activities described herein, Defendant has been unjustly enriched by its wrongful receipt of Plaintiff and Class Members' monies.

154.   As a direct and proximate result of Defendant's wrongful conduct and unjust enrichment, Plaintiff and Class Members have incurred damages in an amount to be determined at trial.

155.   Defendant should be required to account for and disgorge all monies, profits, and gains which they have obtained or will unjustly obtain in the future at the expense of consumers.

## CLASS ACTION ALLEGATIONS

156.   Plaintiff brings this lawsuit as a class action on behalf of himself and all other Class Members similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), (b)(2), and/or (c)(4).  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

157.   Plaintiff brings this class action, including all causes of action stated below, on behalf of himself and all other similarly situated members of the proposed Class defined as follows:

> All individuals and entities in California that purchased a new SSBS Vest from Defendant or one of its sales representations or authorized distributors.

For purposes of Plaintiff's warranty claims in Counts I-II, the relevant class period is from February 20, 2013 up to the date a Class is certified by this Court. For purposes of Plaintiff's Unfair Competition Law and False Advertising Law claim in Counts III-IV, the relevant class period is from February 20, 2014 up to the date a Class is certified by this Court.[10]

158. Specifically excluded from the proposed Class are Defendant, its affiliates, parents and subsidiaries, all directors, officers, agents, and employees of Defendant, its distributors, joint ventures and entities controlled by Defendant, its heirs, successors, assigns or other persons or entities related to, or affiliated with, Defendant, and the Judge(s) assigned to this action, and any member of their immediate families.

159. Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment, amended complaint, or at the class certification proceedings.

160. The prerequisites to class certification under Fed. R. Civ. P. 23(a) are met in that:

A. **Numerosity**: The members of the Class are so numerous that joinder of all members is impractical. There are thousands of Class Members. The precise number of Class Members, their identities, the organization or entity (where applicable) to which each purchaser is associated, the date of purchase, the location of purchase, the model SSBS Vest purchased, the serial numbers of the ballistic panels, the date of manufacture, the dates of issuance and invoicing,

---

[10] As set forth in paragraph 145 above, the statute of limitations for Plaintiff and all Class Members' claims was tolled for 1 year and 10 days. Accordingly, the class period for the UCL and FAL claims herein commence 5 years and ten days prior to this filing, and the warranty class on Defendant's five-year warranties commence six years and ten days prior to this filing.

where Defendant shipped each vest, the exact price Defendant received for each vest and more is all readily shown in Defendant's sales databases.

B.     **Existence and Predominance of Common Questions**: Plaintiff's claims raise questions of law and fact common to all Class Members, and all of which can be answered with common proof.  Among the questions of law and fact common to the Class are the following:

      i.     Whether the SSBS Vests are defective;

      ii.     Whether the SSBS Vests fail to comply with the express and implied warranties provided by PBE;

      iii.     Whether PBE knew or should have known about the SSBS defects, and, if so, how long PBE knew or should have known of the defects;

      iv.     Whether PBE misled and continues to mislead purchasers in California regarding the qualities, characteristics, and performance of the SSBS;

      v.     Whether PBE concealed the defective nature of its SSBS Vests from the Class Members;

      vi.     Whether PBE represented, through its words and conduct, that the SSBS Vests and SSBS had characteristics, uses, or benefits that it did not actually have, in violation of the UCL and FAL;

      vii.     Whether PBE represented, through its words and conduct, that the SSBS Vests and SSBS were of a particular standard, quality, or grade when they were of another, in violation of the UCL and FAL;

      viii.     Whether PBE's affirmative misrepresentations about the true defective nature of the SSBS Vests were likely to create confusion or misunderstanding in violation of the UCL and FAL;

      ix.     Whether PBE's affirmative misrepresentations about the true defective nature of the SSBS Vests were and are false, misleading or reasonably likely to deceive, in violation of the UCL and FAL;

x.     Whether PBE has otherwise engaged in unfair and deceptive conduct in connection with the manufacture, marketing and sale of SSBS Vests, including failing to act honestly and in good faith and fair dealing;

xi.    Whether the SSBS Vests were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

xii.   Whether PBE effectively disclaimed its implied warranties in the Care and Maintenance Manual delivered to purchasers of SSBS Vests after the sale for the first time;

xiii.  Whether taping or pinning the failed SSBS together constitutes an alteration that voids the express warranties;

xiv.   Whether purchasers of SSBS Vests are third party beneficiaries of PBE's express and implied warranties;

xv.    What is the measure and amount of damages incurred by Plaintiff and Class Members;

xvi.   Whether Defendant's actions proximately caused damages to Plaintiff and the Class Members;

xvii.  Whether Defendant is liable for punitive or exemplary damages;

xviii. Whether Plaintiff and the Class Members are entitled injunctive or declaratory relief; and

xix.   Whether Defendant was unjustly enriched by the conduct complained of herein;

C.     **Typicality**: Plaintiff's claims are typical of, if not identical, to the claims of each member of the Class because he and all Class Members purchased SSBS Vests which all suffer from the same latent defects in the SSBS, PBE's conduct in its marketing and sale of its SSBS Vests was uniform, including its failure to disclose the defects in the SSBS Vests, and all class member claims are grounded in the same warranties, as well as uniform deceptive and unfair acts and

omissions by Defendant.  Plaintiff and the other Class Members seek identical remedies under identical legal theories, and there is no antagonism or material factual variation between Plaintiff's claims and those of other Class Members. The application of legal principals and proof will essentially be the same for all Class Members.

D.  **Adequacy**: Plaintiff will fairly and adequately protect the interests of all class members.  Sergeant Porras has retained competent counsel who are experienced in complex litigation, including class action litigation involving defective body armor against this same Defendant, and who will prosecute this action vigorously.  Sergeant Porras will fairly and adequately assert and protect the interests of the Class.  He does not have any interests antagonistic to or in conflict with the Class; his interests are antagonistic to the interests of the Defendant; and he will vigorously pursue the claims of the Class.  Sergeant Porras has adequate financial resources to vigorously pursue this action, including an agreement by his counsel to prosecute this action on a contingent basis and to advance the reasonable and necessary costs and expenses of litigation.

161.  Counts I through V of this action may be maintained as a class action under Fed. R. Civ. P. 23(b)(3) because the questions of law or fact common to the Class Members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The pertinent factors under Rule 23(b)(3) that demonstrate that a class action is a superior method of litigating this controversy include:

A.  <u>The Class Members' interests in individually controlling the prosecution or defense of separate actions</u>: In view of the complexity of the issues and expense of litigation, it is impractical for Class Members to bring separate actions, and there is no reason to believe that Class Members desire to proceed

1    separately.  This is particularly so given that separate claims of individual Class

2    Members are insufficient in amount to support separate actions;

3    B.      The nature and extent of any litigation concerning the controversy already

4    begun by or against Class Members: To Plaintiff's knowledge, no other case is

5    pending against PBE concerning the claims of Class Members in California and

6    thus, certification is appropriate here on the grounds of judicial economy;

7    C.      The desirability or undesirability of concentrating the litigation of the

8    claims in this forum: This District is a desirable and appropriate forum for

9    litigation of the claims of the Class Members in California.  Indeed, the class is

10   limited to claims solely on behalf purchasers of SSBS Vests from California.

11   They and other witnesses and evidence relevant to their claims are located in this

12   forum and their claims will be decided under California law, including certain

13   consumer law claims only applicable to citizens of California.

14   D.      The likely difficulties in managing a class action: This case presents no

15   unusual management difficulties, and to the contrary, is ideally suited to class

16   treatment.  The claims involve issues based on the uniform warranties, uniform

17   law (California), uniform latent defects, the same vest problems, and the size of

18   the Class is too large for individual litigation, but not so large as to present an

19   obstacle to manageability as a class action.  The damages or other financial

20   detriment suffered by Plaintiff and the Class Members are relatively small

21   compared to the burden and expense that would be required to individually

22   litigate their claims against Defendant, so it would be impracticable for class

23   members to individually seek redress for Defendant's wrongful conduct.  Even

24   if Class Members could afford litigation, the court system could not.

25   Individualized litigation creates a potential for inconsistent or contradictory

26   judgments and increases the delay and expense to all parties and the court

27   system. By contrast, the class action device presents far fewer management

28

CLASS ACTION COMPLAINT

difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### (Breach of Warranty in Warranty Statements)

162.   Plaintiff incorporates and realleges the above allegations, as if fully set forth herein.

163.   All SSBS Vests sold by PBE included express warranties that the vests were free of defects in materials and workmanship and conformed to certain performance standards as set forth above.  Plaintiff and the other Class Members were exposed to these express warranties and reasonably relied upon such promises and affirmations of facts contained therein.

164.   Defendant has breached its express warranties regarding the characteristics of the SSBS Vests as contained in the warranties provided by Defendant. The degradation and sudden failure (as soon as within one year) of the SSBS breaches the warranty against defects in materials and workmanship.  Additionally, the SSBS is not "highly-effective" and does not in fact last "throughout the life of the vest."  Nor does it "keep[] the ballistics completely suspended . . . throughout the life of the vest." Similarly, the SSBS is not "robust enough to handle different wear and climate conditions."

165.   Defendant has breached its express warranties regarding its obligations to repair or replace the defective SSBS Vests at no cost to all purchasers.  And, as set forth above, Defendant's express warranties fail of their essential purpose and are unconscionable.

166.   As a direct and proximate result of these breaches of warranty, Plaintiff and the other class members were injured and damaged in the amount of the purchase prices of their vests and have not received the benefit of the bargain.

167.   All conditions precedent to Defendant's liability under this claim have been performed by Plaintiff.   As discussed herein, Plaintiff has complied with all applicable notice requirements.

## SECOND CAUSE OF ACTION
### (Breach of Implied Warranty of Merchantability)

168.   Plaintiff incorporates and realleges the above allegations, as if fully set forth herein.

169.   Defendant, through its agents, employees and/or subsidiaries, manufactured, marketed, sold, or distributed SSBS Vests.   When Defendant placed the SSBS Vests into the stream of commerce, it impliedly warranted that the Vests were of merchantable quality, and fit for use as safe and effective body armor.

170.   All SSBS Vests sold by PBE, by operation of law, came with an implied warranty that they were merchantable.

171.   Plaintiff and the other class members reasonably relied upon the skill, superior knowledge, and judgment of Defendant as to whether the SSBS Vest was of merchantable quality and fit and safe for its intended and ordinary use.   Plaintiff and all Class Members were and are foreseeable users of the SSBS Vests, and they purchased such vests for their ordinary and intended purpose.

172.   The SSBS Vests were defective when transferred from PBE, the warrantor.   Among other things, the degradation and sudden failure (as soon as less than one year) of the SSBS breaches the implied warranty of merchantability.   In fact, when the SSBS fails, the SSBS Vest is no longer able to perform as a vest, as the SSBS is what holds the vest together and allows it to be worn as a vest.

173.   Due to Defendant's wrongful conduct, as alleged herein, Plaintiff and other Class Members could not have known about the latent defects, problems and risks associated with the SSBS Vests.

174.   As a direct and proximate result of these breaches of the implied warranty of merchantability, Plaintiff and Class Members have been damaged in the amount of the purchase price of their vests.

175.   All conditions precedent to Defendant's liability under this claim have been performed by Plaintiff.   As detailed above, Plaintiff has complied with all applicable notice requirements.

### THIRD CAUSE OF ACTION
**(Violations of California Business & Professions Code §§ 17500, *et seq.*)**

176.   Plaintiff incorporates and realleges the above allegations, as if fully set forth herein.

177.   This cause of action is brought pursuant to the False Advertising Law at Business & Professions Code §§ 17500, *et seq*. which states in relevant part:

> It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or . . . any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, . . . or . . . not to sell that personal property . . . as so advertised.

178.   Defendant's acts and practices, as described herein, have deceived and/or are likely to continue to deceive class members and the public.  As described above, and throughout this Complaint, Defendant misrepresented the characteristics, uses, and benefits of the SSBS Vest, while affirmatively concealing the vests' defects.

179.   Defendant disseminated uniform advertising to the public in California that: (a) contained statements that were untrue or misleading; (b) Defendant knew, or in the exercise of reasonable care should have known, were untrue or misleading; (c) concerned the nature and characteristics of goods or services intended for sale to California consumers, including Sergeant Porras and the Class; and (d) were likely to mislead or deceive a reasonable consumer.  The advertising was, by its very nature,

48

unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code §§ 17500, *et seq*. Such advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

180. Defendant has engaged in the advertising and marketing set forth herein with an intent to directly or indirectly induce consumers to purchase SSBS Vests.

181. Defendant's representations regarding the characteristics, uses and benefits of the SSBS Vests were false, misleading, and deceptive.

182. The false and misleading representations were intended to, and did, deceive reasonable consumers, including Sergeant Porras and the Class.

183. The false and misleading misrepresentations and omissions were each material and a substantial factor in influencing Sergeant Porras and Class Members' decisions to purchase SSBS Vests.

184. Sergeant Porras and the Class relied on the false and misleading representations and omissions regarding the characteristic, performance, uses, benefits of SSBS Vests; each was exposed to Defendant's false representations and was the intended target of such false representations. The false advertisements played a substantial part in influencing Sergeant Porras and Class Members' decisions to purchase SSBS Vests.

185. Sergeant Porras and the Class lost money or property as a result of Defendant's false advertising insofar as he and the Class Members would not have purchased SSBS Vests if they had reason to know that Defendant had and has been engaging in false advertising.

186. Sergeant Porras, individually and on behalf of the Class, seeks restitution, disgorgement, injunctive relief, and all other relief provided under §§ 17500, *et seq*.

187. As set forth herein, Plaintiff and Class Members have been aggrieved and suffered damages by Defendant's deceptive, unfair, and/or unconscionable acts and practices such that they are entitled to affirmative injunctive relief requiring Defendant to cease selling the defective SSBS Vests and to notify all Class Members of the defects

1   in the vests and the safety hazard associated with continued use, including the sudden

2   and unexpected failure of the SSBS while in the line of duty causing the ballistic panels

3   to detach from the shoulder straps.

4       188.   Plaintiff has a substantial likelihood of success on the merits.   Indeed,

5   prior problems and unfair and deceptive conduct with various of Defendant's brand

6   vests spawned multiple class actions, a nation-wide safety notice, cessation of sale, and

7   the recall and replacements of tens of thousands of vests.   *See* footnotes 1, 6, *supra* (list

8   of prior actions against Defendant's subsidiaries and prior unfair and deceptive

9   conduct).  Here, the acute safety issue and injury to Class Members outweighs whatever

10  damage the requested injunction may cause Defendant.   Furthermore, the requested

11  injunction, if issued, will be in the best interest of California's law enforcement

12  community and the public interest as opposed to being adverse to the public interest.

13      189.   If the injunctive relief is not provided, then irreparable injury to some

14  users, *i.e.*, bodily injury, may result.   The requested injunctive relief is therefore

15  necessary to prevent Defendant from continuing to engage in the unlawful conduct

16  alleged herein, which, if left unabated, will cause future injury to the public.  Monetary

17  damages and restitution, alone, are not sufficient to address Defendant's ongoing

18  wrongful conduct and the present and future harm caused thereby.

19

20

## FOURTH CAUSE OF ACTION
### (Violations of California Business & Professions Code § 17200, *et seq.*)

21      190.   Plaintiff incorporates and realleges the above allegations, as if fully set

22  forth herein.

23      191.   Sergeant Porras and Defendant are "person[s]" as defined by California

24  Business & Professions Code § 17201.   California Business & Professions

25  Code § 17204 authorizes a private right of action on both an individual and

26  representative basis.

27      192.   "Unfair competition" is defined by Business & Professions Code § 17200

28  as encompassing several types of business "wrongs," including, but not limited to:

(1) an "unlawful" business act or practice, (2) an "unfair" business act or practice, and (3) "unfair, deceptive, untrue or misleading advertising." The definitions in § 17200 are drafted in the disjunctive, meaning that each of these "wrongs" operates independently from the others.

193. At all relevant times hereto, Defendant's actions in advertising, marketing, soliciting, offering, promoting, distributing, and selling SSBS Vests in California constituted "trade or commerce"

194. Within the five-year period prior to the filing of the Complaint and continuing to the present, PBE, in the course of trade and commerce, engaged in unconscionable, unfair, and/or deceptive acts or practices harming the Plaintiff and Class Members as described herein.

195. By and through Defendant's conduct alleged herein, Defendant engaged in conduct which constitutes unlawful and/or unfair business practices, and unfair, deceptive, untrue, or misleading advertising prohibited by Business & Professions Code §§ 17200, *et seq.*

196. During all relevant times through the filing of this action, Defendant committed acts of unfair competition, including those described above, by engaging in a pattern of "unlawful" business practices, within the meaning of Cal. Bus. & Prof. Code § 17200 by engaging in conduct described hereinabove that violates Cal. Bus. and Prof. Code §§ 17500, *et seq.* and Cal. Civil Code §§ 1750, *et seq.*, and California common law.

197. Defendant violated § 17200's prohibition against engaging in unlawful acts and practices by engaging in false and misleading advertising and by omitting material facts from purchasers of its SSBS Vests. As alleged more fully herein, Defendants' marketing and sale of SSBS Vests, and more specifically its failure to inform Plaintiff and other Class Members of the serious defects inherent in the Vests, violated California statutory and common law. Plaintiff reserves the right to allege

other violations of the law, which constitute other unlawful business acts and practices. Defendant's conduct is ongoing and continues to this date.

198.    During all relevant times through the filing of this action, Defendant committed acts of unfair competition that are prohibited by Business & Professions Code §§ 17200, *et seq*.  Defendant engaged in a pattern of "unfair" business practices as illustrated with specific examples below.

199.    Alternatively, and as described below, Defendant engaged in a pattern of "unfair" business practices that violate the wording and intent of the aforementioned statutes by engaging in practices that are immoral, unethical, oppressive, or unscrupulous, the utility of such conduct, if any, being far outweighed by the harm done to consumers and against public policy by advertising, offering and selling SSBS Vests to Sergeant Porras and the Class with qualities, characteristics, benefits, and uses that they did not actually have.

200.    Alternatively, and as described below, Defendant engaged in a pattern of "unfair" business practices that violate the wording and intent of the abovementioned statutes by engaging in practices, including providing false warranties, advertising false benefits, characteristics, and qualities of SSBS Vests wherein: (1) the injury to the consumer was substantial; (2) the injury was not outweighed by any countervailing benefits to consumers or competition; and (3) the injury was not of the kind that consumers themselves could not have reasonably avoided.

201.    Defendant's advertising is unfair, deceptive, untrue, or misleading in that consumers are led to believe that the SSBS Vests have characteristics and qualities they do not have and that the vests would provide benefits and uses that they will not.  At the time Sergeant Porras purchased his SSBS Vest, Defendant knew that it had latent defects in manufacturing, material, workmanship, and design and would deteriorate and fall apart rapidly (and did deteriorate and fall apart in the line of duty well within the stated warranty period and useful life of the vest).  Defendant concealed that information and continued to falsely advertise otherwise so to obtain/generate from

Sergeant Porras and members of the Class (and that did generate) millions of dollars of revenue. Defendant has continued to falsely advertise and sell SSBS Vests up through the filing of this action, by, among other things, failing to disclose, actively concealing the latent defects in the vests and by both concealing and affirmatively misrepresenting the true quality, characteristics, uses, and benefits of the SSBS.

202. Defendant engaged in the wrongful conduct alleged herein to gain an unfair commercial advantage over its competitors, seeking to avoid public knowledge of the inherent defects in its SSBS Vests to avoid damage to its sales or reputation. It withheld critical and material information from Plaintiff and Class Members, competitors, and the marketplace, all to its unfair competitive advantage

203. Defendant's business acts and practices are fraudulent within the meaning of the California Business & Professions Code §§ 17200, *et seq.* Defendant engaged in misleading, deceptive, fraudulent, and unfair conduct in the marketing and sale of its SSBS Vests - a defective product which presents a public hazard, and which places the lives of law enforcement officers at unjustifiably heightened risk. Defendant continues to engage in misleading, deceptive, fraudulent, and unfair acts and practices in trade and commerce with respect to the sale of SSBS Vests. This conduct includes, among other things: (i) representing that its SSBS Vests have characteristics and benefits they do not have; (ii) representing that its SSBS Vests are of a particular standard or quality when they are not; (iii) knowingly issuing deceptive and misleading information regarding the durability, effectiveness, and performance of the SSBS system in California released as recently as January 19, 2018; (iv) representing that the latent defects and resulting failures of the SSBS are a result of purported misuse by not disconnecting the SSBS in some gentle, special, and impractical manner never disclosed to Class Members; and (v) failing to disclose material facts regarding the premature failure of the SSBS rendering the SSBS Vests worthless to officers.

204. Defendant further engaged in misleading, deceptive, fraudulent, and unfair conduct including but not limited to: (i) failing to notify Plaintiff and the Class

of the defects in the SSBS Vests and that the vests are prone to unexpectedly falling apart in the line of duty; (ii) selling SSBS Vests (or permitting them to be sold either directly or through its distribution channels), that are represented to be new but in fact have ballistic panels with manufacture and issue dates up to four and a half years old; (iii) informing Class Members that replacement SSBS straps will correct the failures and charging Class Members for replacement SSBS straps if their vests are more than two years old; and (iv) failing to honor its warranties and recall and replace the defective SSBS Vests.  These actions constitute misleading, deceptive, fraudulent, and unfair acts or practices in the conduct of trade or commerce in violation of the California Business & Professions Code §§ 17200, *et seq.*

205.  By way of additional specific examples, Defendant, an entity with exclusive knowledge regarding the latent defects and true qualities, true characteristics, true origin of materials and components, and true benefits of the SSBS Vests, had a duty to disclose material facts regarding the SSBS; namely, that the latent defects result in severe and accelerated deterioration of the SSBS under normal use, thus creating a safety risk for purchasers.  Sergeant Porras and the Class reasonably expected that Defendant would disclose any material facts that a reasonable consumer would consider important in deciding whether to purchase SSBS Vests.  Sergeant Porras and the Class also reasonably expected that Defendant would not sell SSBS Vests claiming, among other things, that they are "highly-effective," that they will last "throughout the life of the vest," that they will "keep[] the ballistics completely suspended . . . throughout the life of the vest," that the SSBS is "robust enough to handle different wear and climate conditions," and that Defendant rigorously tested the SSBS, when in fact the statements were not true.  In truth, Defendant knew that the SSBS had latent and defects it was unable to fix which cause the SSBS to deteriorate rapidly and severely at alarmingly-high rates.  By failing and refusing to disclose this material information regarding the SSBS Vests, Defendant has engaged in actionable,

CLASS ACTION COMPLAINT

fraudulent conduct within the meaning of the California Business & Professions Code §§ 17200, *et seq.*

206.   Sergeant Porras and Class Members were exposed to Defendant's multimedia marketing campaign touting the supposed durability, quality, and performance of its SSBS Vest and purchasers justifiably made their decisions to purchase SSBS Vest as a result of Defendant's misleading marketing and concealment of the true, defective nature of the SSBS.

207.   Sergeant Porras, a reasonable consumer, the Class, and the public are likely to be, and, in fact were, deceived and mislead by Defendant's unfair business practices.

208.   Defendant engaged in these unlawful and unfair business practices motivated solely by self-interest with the primary purpose of collecting unlawful and unauthorized monies from Sergeant Porras and the Class, thereby unjustly enriching Defendant.

209.   Such acts and omissions by Defendant are unlawful and/or unfair and constitute a violation of California Business & Professions Code §§ 17200, *et seq.* Sergeant Porras reserves the right to identify additional violations by Defendant as may be established through discovery.

210.   As a direct and proximate result of the aforementioned acts and representations described above and herein, Defendant received and continues to receive unearned commercial benefits at the expense of the Class and the public.

211.   As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent conduct described herein, Defendant has unlawfully benefitted by the receipt of ill-gotten gains from customers, including Sergeant Porras and all members of the Class who unwittingly provided money to Defendant based on Defendant's actual and implied representations when Defendant's advertised representations were false, artificial, illusory, and unlawful.

212.   Sergeant Porras suffered an "injury in fact" because his money was taken by Defendant as a result of Defendant's unfair, unlawful, deceptive business practices and false advertising.

213.   As a direct and proximate result of Defendant's practices in violation of the California Business & Professions Code §§ 17200, *et seq.*, Sergeant Porras and members of the Class have incurred actual damages in the amount of the purchase price of their vests.

214.   Tens of thousands of SSBS Vests have been purchased by Class Members including law enforcement personnel within the relevant time period.

215.   Tens of thousands of Class Members, including law enforcement personnel and others who use the SSBS Vests and continue to purchase the SSBS Vests are unaware of the defects in the vests.

216.   In prosecuting this action for the enforcement of important rights affecting the public interest, Sergeant Porras seeks the recovery of attorneys' fees, which is available to a prevailing plaintiff in class action cases such as this matter.

217.   Defendant's misrepresentations and omissions alleged herein caused Sergeant Porras and the Class to purchase defective SSBS Vests.  Absent those misrepresentations and omissions, Sergeant Porras and the Class would not have purchased defective SSBS Vests.

218.   Pursuant to Business & Professions Code § 17203, Sergeant Porras and the California Class seek from Defendant restitution and the disgorgement of all earnings, profits, compensation, benefits, and other ill-gotten gains obtained by Defendant as provided in Business & Professions Code § 17203 as a result of its conduct in violation of Business & Professions Code §§ 17200, *et seq.*

219.   As set forth herein, Plaintiff and Class Members are persons have been aggrieved and suffered damages as a result of Defendant's deceptive, unfair, and/or unconscionable acts and practices such that they are entitled to affirmative injunctive relief requiring Defendant to cease selling the defective SSBS Vests and to notify all

56

1   Class Members of the defects in the vests and the safety hazard associated with
2   continued use, including the sudden and unexpected failure of the SSBS while in the
3   line of duty causing the ballistic panels to detach from the shoulder straps.

4   220.   Plaintiff has a substantial likelihood of success on the merits.   Indeed,
5   prior problems and unfair and deceptive conduct with various of Defendant's brand
6   vests spawned multiple class actions, a nation-wide safety notice, cessation of sale and
7   the recall and replacements of tens of thousands of vests.   *See* footnotes 1, 6, *supra* (list
8   of prior actions against Defendant's subsidiaries and prior unfair and deceptive
9   conduct).  Here, the acute safety issue and injury to Class Members outweighs whatever
10  damage the requested injunction may cause Defendant.   Furthermore, the requested
11  injunction, if issued, will be in the best interest of California's law enforcement
12  community and the public interest as opposed to being adverse to the public interest.

13  221.   If the injunctive relief is not provided, then irreparable injury to some
14  users, *i.e.,* bodily injury, may result.   The requested injunctive relief is therefore
15  necessary to prevent Defendant from continuing to engage in the unlawful conduct
16  alleged herein, which, if left unabated, will cause future injury to the public.  Monetary
17  damages and restitution, alone, are not sufficient to address Defendant's ongoing
18  wrongful conduct and the present and future harm caused thereby.

19
20
**FIFTH CAUSE OF ACTION**
**(Fraudulent Concealment)**

21  222.   Plaintiff incorporates and realleges the above allegations, as if fully set
22  forth herein.

23  223.   Plaintiff brings this cause of action for himself and on behalf of Class
24  Members.

25  224.   Defendant concealed and suppressed material facts concerning the true
26  quality, characteristics, durability, and performance of the SSBS in the SSBS Vests to
27  induce Plaintiff and Class Members to purchase SSBS Vests, and did induce Plaintiff
28  and Class Members to purchase their SSBS Vests.

225.   Defendant concealed and suppressed material facts concerning the serious and latent defects causing the SSBS to prematurely fail and fall apart on Class Members wearing the life-critical vests.

226.   Defendant knew that Plaintiff and Class Members would not be able to detect the defects prior to purchasing their SSBS Vests.  Defendant furthered and relied upon this lack of disclosure to promote payments for temporary "fixes" and replacement straps (additional sets of the same defective straps) it marked up over 10,000%, and, Defendant has wrongfully accused (without any testing or supporting information whatsoever) purchasers of causing the problem themselves – all the while concealing the true nature and cause and the defects from Plaintiff and Class Members. Defendant further (and repeatedly) denied the very existence of the defects when purchasers complained of the defects.

227.   Defendant concealed and suppressed these material facts that it knew about well prior to the purchase of all SSBS Vests at issue in this matter and instead pushed supposed "fixes" like additional defective straps and replacing other material or stitching with the same defective material or stitching.

228.   Defendant did so in order to boost confidence in the SSBS Vests and to falsely assure purchasers that the vests were durable, reliable, "highly effective," "revolutionary," unsurpassed, used "zero compromises," and have the "world's finest performance" in order to prevent harm to Defendant and its products' reputations in the marketplace and to prevent consumers from learning of the defective nature of the SSBS Vests prior to their purchase.  These false representations and omissions were material to consumers, both because they concerned the quality of the SSBS Vests and because the representations and omissions played a significant role in their decisions to purchase the vests.

229.   Defendant had a duty to disclose the latent defects in the SSBS Vests because the defects were known and/or accessible only to Defendant; Defendant had superior knowledge and access to the facts; and Defendant knew the facts were not

known to or reasonably discoverable by Plaintiff and Class Members.  Defendant also had a duty to disclose because it made many general affirmative representations about the quality, characteristics, durability, and performance of the SSBS and lack of defects in the SSBS Vests as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality, characteristics, durability, performance, and usability.  Even when faced with complaints from Class Members and other purchasers across the country regarding the defects, Defendant misled and concealed the true cause of the problems complained of.  As a result, Class Members were misled as to the true condition of the SSBS Vests at least once at the time of purchase and again if complained about to Defendant.   The omitted and concealed facts were material because they directly impact the value, appeal, and usability of the SSBS Vests purchased by Plaintiff and Class Members.  Whether a manufacturer's products are as stated by the manufacturer, backed by the manufacturer, and usable for the purpose for which they were purchased, are material concerns to a consumer, in particular consumers of life-critical safety products.  Defendant's management has acknowledged and testified that the failure of the SSBS Vests experienced by purchasers are serious issues involving life-critical products and not nuisances.  "[Q.]  I mean we can agree that the issue here is not nuisance but a lifesaving product; correct?  [A.] Yes, it's a lifesaving product."

230.   Defendant actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid recalls that would hurt the brand's image and cost money, and it did so at the expense of Plaintiff and Class Members.

231.   Defendant has still not made full and adequate disclosure and continues to defraud Plaintiff and Class Members and conceal material information regarding defects that exist in the SSBS Vests.

232.   Plaintiff and Class Members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or

suppressed facts, in that they would not have purchased their SSBS Vests or chosen different models not known to have the defects.  Plaintiff and Class Members' actions were justified.  Defendant was in exclusive control of the material facts and such facts were not known to the public, Plaintiff, or Class Members.

233.   Because of the concealment and/or suppression of the facts, Plaintiff and Class Members sustained damages because they negotiated and paid value for the SSBS Vests not considerate of the defects that Defendant failed to disclose.  Had they been aware of the concealed defects that exist in the SSBS Vests, Plaintiff and Class Members would not have purchased them at all.

234.   Accordingly, Defendant is liable to Plaintiff and Class Members for the purchase price of their vests and such other and further damages in an amount to be proven at trial.

235.   Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class Members' rights and well-being to enrich Defendant.  Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff on behalf of himself and members of the Class defined herein, prays for judgement and relief as follows:

(a)     An order certifying that this action may be maintained as a class action as defined above and appointing Plaintiff as class representative and undersigned counsel as class counsel;

(b)     An award of actual, statutory, punitive, and/or other damages and losses in the maximum amount permitted by applicable law;

(c)     Restitution and disgorgement of the unlawful profits collected by Defendant;

(d)     An order providing for injunctive relief in favor of Plaintiff and the Class against Defendant requiring Defendant to cease selling SSBS Vests and to notify all class members of the defects and life-threatening safety problems with the vests;

(e)     An award of prejudgment and post-judgment interest at the maximum legal rate be entered in favor of Sergeant Porras and the Class on their damages;

(f)     Plaintiff's attorneys' fees and costs of suit, under Cal. Code Civ. Proc. § 1021.5, and as otherwise allowed by law;

(g)     Leave to amend this Complaint to conform to the evidence produced at trial; and

(h)     Such other and further relief as may be just and appropriate.

## <u>DEMAND FOR JURY</u>

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby respectfully demands a Jury Trial in this matter on all issues so triable.

Respectfully submitted,

DATED:  March 1, 2019

JOHNSON FISTEL, LLP
FRANK J. JOHNSON

*/s/ Phong L. Tran*
PHONG L. TRAN

655 West Broadway, Suite 1400
San Diego, CA  92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
FrankJ@johnsonfistel.com
PhongT@johnsonfistel.com

*Liaison Counsel for Plaintiff Miguel Porras*

COMPLEX LAW GROUP, LLC
David M. Cohen, Esq.
Ga. Bar No. 173503
dcohen@complexlaw.com
40 Powder Springs Street
Marietta, Georgia 30064
Telephone: (770) 200-3100
Facsimile: (770) 200-3101
*Pro Hac Vice to be filed*

KANNER & WHITELEY, LLC
Allan Kanner
CA Bar No. 109152
a.kanner@kanner-law.com
Cynthia St. Amant, Esq.
c.stamant@kanner-law.com
La. Bar No. 24439
701 Camp Street
New Orleans, Louisiana 70130
Telephone: (504) 524-5777
Facsimile: (504) 524-5763
*Pro Hac Vice to be filed*

*Attorneys for Plaintiff Miguel Porras*

CLASS ACTION COMPLAINT